UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | )   No. 3:19 CR 43-JCH |
| | ) |
| STEVEN GOLD, | ) |
| | ) |
| Defendant. | ) |

**STEVEN GOLD'S SENTENCING MEMORANDUM**

**NOW COMES,** Mr. Steven Gold, by his attorney Gal Pissetzky, and files the following Sentencing Memorandum:

**I.     Introduction**

Steven Gold's life was defined by battling through and doing everything in his power to overcome an unimaginable childhood. At the age four, his mother tried to abandon him and his siblings at a police station because she felt she could not care for them. Throughout school, Mr. Gold was bullied, beat up, and tormented by his peers. And as a teen, Mr. Gold learned his mother's ex-husband was not his real father. Mr. Gold buried the feelings associated with these traumatic events and instead lived a life dedicated to putting others before himself.

When his parents ignored and gave up on his brother who struggled with mental illness, Mr. Gold took it upon himself to care for him. As an adult, Mr. Gold enlisted in the Army Reserve/National Guard where he served as a Medical Specialist for eight years before receiving an Honorable Discharge. As a father, Mr. Gold opened his home to homeless teens struggling to deal with issues at home. For years, Mr. Gold fed, supported, and pushed these troubled kids to attend college. Mr. Gold gave when others would not. Despite his best efforts, Mr. Gold could not save everyone. His son struggled with drug issues and overdosed. Luckily his son survived, but

1

Mr. Gold broke down. The weight of the childhood trauma he silently carried for decades, coupled with the feeling that he failed his family, proved too much and Mr. Gold began down the self-destructive road that led him before this court.

This is not to say Mr. Gold believes he is innocent or that his difficult upbringing shields him from responsibility -far from it. Mr. Gold comes before this court ready and willing to be held accountable for his actions, but implores it to resist the urge to send someone to prison who has done everything in his power to right the wrongs he caused and confront the inner demons that led him to commit these offenses. As will be further expounded upon below, Mr. Gold's selfless devotion to helping others and his earnest commitment to right the wrongs he committed prove a sentence of probation is "sufficient, but not greater than necessary". 18 U.S.C. § 3553(a).

## II.     Offense Level Calculations

Mr. Gold waived Indictment and pled guilty to both Counts One and Two of the Information which charged him with violating 18 U.S.C. §§ 1349 and 1343, respectively. As the PSR correctly outlines, Mr. Gold's base offense level is 7. Because the total loss amount attributable to Mr. Gold is more than $3,500,000 but less than $9,500,000, the offense level is increased by 18 levels. Because Mr. Gold abused a position of trust and used a special skill as an account, the offense level is increased by an additional 2 levels. The resulting total adjusted offense level is 27.

Mr. Gold clearly demonstrated an acceptance of responsibility. Moreover, by waiving indictment and pleading guilty, Mr. Gold saved the government resources, money, and countless hours that would have been needed to review voluminous discovery and further prosecutions in two separate districts.  Accordingly, the offense level is decreased by 3 levels, resulting in a Total Offense Level of 24. Prior to this offense, Mr. Gold had zero criminal history to speak of and is

credited with a criminal history score of zero, establishing a Criminal History Category of I.

Criminal History Category I coupled with a Total Offense Level of 27 results in an advisory guideline range of 51-63 months. As will be further expounded upon below, a sentence within this range proves too harsh.

### III.     Sentencing Considerations Pursuant to 18 U.S.C. § 3553(a) Support a Sentence of Probation

After first calculating the applicable sentencing range, district courts are then tasked with imposing a sentence that is reasonable under 18 U.S.C. § 3553(a). Over fifteen years ago, the United States Supreme Court ruled that the Sentencing Guidelines are only advisory in nature. *United States v. Booker*, 125 S. Ct. 738, 765-67 (2005). As a result, this Court maintains unfettered discretion to fashion a sentence that punishes the offender, as opposed to just the crime. *Pepper v. United* States, 562 U.S. 476 (2011). In fashioning a sentence, "district courts are not permitted to assume that guidelines sentence is substantively reasonable," *United States v. Pugh*, 945 F.3d 9, 27 (2d Cir. 2019) (citing *Rita v. United States*, 551 U.S. 338, 351 92007)). In fact, a guideline sentence "can be substantively unreasonable." *Id*. The guideline range is only but a single factor for this Court to consider. *Kimbrough v. United States,* 552 U.S. 85, 92 (2007).

Indeed, a sentence's reasonableness depends on the court's "independent review of the sentencing factors," set forth in 18 U.S.C. § 3553(a)(2)." *United States v. Cavera*, 550 F.3d 180, 188-89 (2d Cir. 2008). As the parsimony provision commands, sentencing courts shall only impose "a sentence sufficient, but not greater than necessary to comply with the purposes set forth" under 18 U.S.C. § 3553. *Id.* at 189. In issuing a sentence that reflects this directive, Section 3553(a) specifically directs courts to consider:

3

"the nature and circumstances of the offense and the history and characteristics of the defendant; the kinds of sentences available; the defendant's guidelines range; any relevant policy statements; the need to avoid unwarranted sentence disparities among defendants with similar records; who have been found guilty of similar conduct; and the need to provide restitution to any victims of the offense."18 U.S.C. § 3553(a).

The statute further directs the sentencing court to impose the shortest sentence possible that (A) reflects "the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;" (B) deters future criminal conduct; (C) protects the public from the defendant; and (D) provides the defendant with the "needed educational or vocational training, medical care, or other correctional treatment in the most effective manner." 18 U.S.C. § 3553.

1. Nature and Seriousness of the Offense

Mr. Gold pled guilty to conspiring with a regional manager of the company he worked for (JST) to defraud the company, all while he was engaging in a separate fraudulent scheme of his own. Mr. Gold's actions are undeniably serious offenses. The decision itself to steal from his employer was reprehensible, and it is a decision Mr. Gold will regret for the rest of his life. He is utterly ashamed of himself, and wishes nothing more than to go back and prevent this from happening. Mr. Gold knows he cannot change the past and even if he could, he may have been hard pressed to stop himself. The motivation behind Mr. Gold's offense was not greed, but a crippling mental condition and an addiction. An underlying circumstance that truly sets his crimes apart from the standard fraud.

While so many engage in fraud out of sheer greed, the financial records show Mr. Gold spent the much of the stolen funds to feed a crippling addiction during a time in his life that his mental health was deteriorating. Although some of Mr. Gold's expenses included vacations, the

pursuit of luxurious items did not push Mr. Gold to commit this offense. Instead, Mr. Gold's offense can be traced to a failure to seek help when he needed it the most.

When his son, Logan, began using drugs Mr. Gold broke down. He felt that he failed to be the father his son needed him to be. This stress strained his marriage and reopened wounds from his own childhood that he never truly faced. It all proved too much. Mr. Gold began drinking heavily to numb the pain and turned to online casinos to fill his despair. Mr. Gold attempted to compensate for his faults as a father by rewarding his family with cruises, and sinking his pain in his own addictions. Mr. Gold's gambling soon spiraled out of control as he racked up thousands of dollars in loses each day. It all came crashing down when federal agents arrested him.

It's clear the man who committed this offense was not the true Steven Gold, and it took him hitting the lowest low for his true self to start coming back. Instead of denying his wrongdoing or shifting blame to others, Mr. Gold cooperated with the government and pled guilty before even being indicted. Mr. Gold knew what he did was wrong, and wants to work towards fixing his mistakes. Steve chose to face his demons, expose his emotions and faults to his family, and seek professional help. Though Mr. Gold has a long way to go, we are all more than the worst decision we've made. Steve is no different. Discounting Mr. Gold's distinct life experiences, which undeniably contributed to this offense, would undermine our system of justice. A system that is not a disinterested assembly line, but one that churns towards fair justice, rehabilitation, and second chances. Looking at the life Mr. Gold lived before this offense and what he did following his arrest shows this offense is wholly irreconcilable with the person he truly is.

 2. **Mr. Gold's Personal History and Characteristics**

Reviewing Mr. Gold's childhood, it is hard to imagine how Steve went through life as long as he did without breaking down. When Mr. Gold was a mere toddler, his mother drove him and

his siblings to the local police station and pled for officers to take them off her hands. As one could expect, the aftermath was not smooth. Steve was sent to live with Robert Busche, who he thought was his father, as a custody battle ensued. Mr. Gold was seemingly the last thing on his mother's mind as she found time to marry Phillip Gold while everything worked its way through the system.

After a few months, Mr. Gold moved back in with his mother and his two siblings. Over the next few years, the family moved towns often, forcing Mr. Gold to change school and make new friends. Around Mr. Gold's ninth birthday, Mr. Gold moved with his brother, Michael, back to Robert's house. Mr. Gold did so because his brother Michael wanted to live with Robert. Michael suffered from schizophrenia, bipolar, and manic depressive disorder, but Robert never accepted that Michael struggled with mental illness. Even at just nine years old, Mr. Gold knew he had to protect his brother from Robert.

The move did not go well as Robert was hardly ever around. Instead of showing his sons compassion, he treated them poorly and left Mr. Gold to raise himself and his brother. Mr. Gold's presence in his brother's life was all important. Michael would act out constantly and would only listen to him. Mr. Gold was the only one who could calm Michael down when he experienced psychotic episodes after not taking his medication. Later in life, Mr. Gold would be the one to convince Michael to go with him to the mental institution so he could be placed back on his medication. From a very young age, Mr. Gold cared for his brother as his primary caretaker until he passed away.

While school can serve as an escape from a chaotic home life, Mr. Gold did not have that luxury. As a child, Mr. Gold suffered from asthma and could not participate in sports. Unable to play with the other kids, and nearly always the 'new kid,' Mr. Gold quickly became a target. He

was bullied and beat up constantly. The torment only stopped when Mr. Gold found another kid he could pay to protect him.

Mr. Gold never truly felt part of a friend group, and went through his teenaged years as a loner. So many of us find who we are during these formative years, but an already ostracized Mr. Gold would only be hit with an earth-shattering revelation. When he was 16 years old, Robert told him he was not his son and that Phillip Gold was his real father. Finding out the man he knew his whole life and desperately sought affection from, was not even his real father made Mr. Gold question everything. What's more, even after coming to terms with who his true father was, Mr. Gold was never accepted into Phillip's family. Even on the day of Phillip's funeral, the Gold family acted like they did know Steven and shunned him.

For decades, Mr. Gold buried these feelings of abandonment, loneliness, and depression deep inside. He did not speak about them and instead devoted himself to helping and trying to please others. At 18 years old, Mr. Gold enlisted in the Army Reserve / National guard. He became a Medical Specialist and achieved the rank of Specialist E4. Mr. Gold was Honorably Discharged after proudly serving his country for 8 years.

During his time with the Army Reserves, Mr. Gold met his wife, Wendy. It was not long before the two fell in love, got married, and started a family of their own. Wendy writes that she did not know a lot about the traumatic childhood circumstances Mr. Gold faced, but believes they are why "he was so animate about being an active part of his children's lives." Mr. Gold always wanted their "boys to have the best opportunity and a better life than he had grouping up." From supporting them on the sidelines, classroom, or wherever life took them, Mr. Gold was always there for his sons.

Not only did Mr. Gold devote himself to becoming the father he never had, he did not hesitate to step up and help his mother when she became disabled. For many, revenge or its fairer cousin karma, at the very least, would guide a decision of whether to care for another -why should he bear the burden of caring for the person who did not do the same for him when he was a child and kept him in the dark about who his father was? Remarkably, these thoughts never crossed Mr. Gold's mind. Instead, he welcomed his mother into his home with open arms. He fashioned a whole portion of his home just for her. He cared for her as she suffered multiple strokes. He took her to her doctor's appointments. He made sure she was always safe and care for. He acted as the parent she failed to be. This is the real Steven Gold -a person that puts others before himself.

Mr. Gold's kindness does not only extend to his family. Far from it. Knowing first-hand how difficult formative teen years can be without the proper guidance, Mr. Gold took it upon himself to take four at risk teens, Alex, Chris, Jenna, and Ashley, into his home. Mr. Gold does not simply feed and provide these kids a place to live, but does everything he can to push them down the right path. Alex Plunkett was in and out of foster care and homeless before meeting Mr. Gold. Mr. Gold pushed him to graduated high school and attend college. Chris Seppala was also homeless when Mr. Gold took him in, but is now enrolled in college. Chris explains Mr. Gold "has been nothing but generous" and "treats [him] like one of [Mr. Gold's] own kids."

Jenna describes her relationship with her father as "terrible" when she moved in with Mr. Gold. Mr. Gold saw the pain she was going through and constantly pushed Jenna to reconcile with her family. Before too long, Mr. Gold "helped [her] build a better relationship with [her] biological father." "Without [Mr. Gold's] help," Jenna asserts, her "life would be much different for the worse." While living with Mr. Gold, Jenna finished high school and plans to enroll at Parkside

with the goal of becoming a lawyer. Mr. Gold "made it possible for [Jenna] to achieve so much while letting [her] figure things out for [her]self."

Even with his house filling up, Mr. Gold did not hesitate to welcome his niece Ashley into his home after she began experiencing problems at home. Mr. Gold pushed Ashley to enroll in college courses, and today Ashley is enrolled at Gateway studying to become a Dental Hygienist. Ashley writes that she loves her uncle "dearly and do[es not] know what [she] would ever do without him."

The same way he ran his house, Mr. Gold never turned down a chance to help in his community. Every year, Mr. Gold attends the Scout Leaders Rescue Squad and Dive Team's Annual Fundraiser where he purchases numerous raffle tickets. Mr. Gold often wins a number of prizes each year, but instead of taking them home, Mr. Gold re-donates the prizes or gives them to a person who he noticed really wanted to win a certain prize. Brain Accaro, the Scout Leaders' Rescue Captain, describes Mr. Gold "as one of the most generous men [he] know[s]."

When Michell Biegler, a friend for years, had major back surgery, she worried how she would be able to get in and out of her bed which sat high off the ground. The day she came home from the hospital, she had no reason to worry. Mr. Gold not only took it upon himself to set a bed up in Michelle's living room that was lower to the ground, but also set up a chair in her shower. When it became clear sitting on her couch would be too painful, Mr. Gold took Michelle to try different recliners until she found the 'one.' Mr. Gold then set it up for her when she came home.

Mr. Gold's 47 years on this earth show he is more than the damaged person who committed this offense. This case has taught Mr. Gold many things, none the least being that you cannot outrun or bury your problems. You must face them and put in hard work to overcome them. If you don't, you will make horrible decisions. That is what happened here. Unfortunately, as hard

as Mr. Gold tried to build the perfect life for his family, his youngest son, Logan began acting out as a teenager. Reacting to his father's preconceived strictness, Logan stopped talking to him, began running with the wrong crowd, and overdosed on Xanax. Though Logan survived, the ordeal completely devastated Mr. Gold. He felt like a failure who was unable to protect his family.

He could not bear the weight of both childhood and adult problems and mentally broke down. Instead of seeking help, Mr. Gold sunk deep into depression. Being in a very dark place, Mr. Gold believed he could gain his family's love by taking them to Disney Land and on cruises. Mr. Gold started drinking heavily, he developed a horrific gambling addiction, and he spent his company's money to fuel his addictions. This behavior hurled himself down the self-destructive path that led him before this court.

The guilt and shame Mr. Gold feels for compounding his issues by not only betraying his employer, but also his family, will be the harshest consequence of all. Mr. Gold worries how his wife, who just underwent serious back surgery, will care for their boys and his mother without him. Mr. Gold spent his entire life doing everything he could to give the people he loved the support he never had. Yet, when they will need him the most, he may be behind bars. It is devasting and torturous for Mr. Gold to come to terms with this guilt, so much so that he attempted to take his own life.

Thankfully, Mr. Gold did not succeed. Soon after his suicide attempt, Mr. Gold began taking steps to rebuild his self-worth and right his wrongs. Mr. Gold began going to counseling. Talking through his childhood issues with his therapist has done wonders for Mr. Gold and his general outlook for the future. Mr. Gold no longer gambles and will never go back to any casino ever again. All that Mr. Gold wants now is to care for his family and work towards building a new career so he can pay back the restitution he owes. He is extremely embarrassed that he took money

from the company that trusted him, and he vowed the pay JST back. Mr. Gold has enrolled in technology courses and hopes to begin a new career. While he studies, Mr. Gold also plans to work at the Amazon facility in Kenosha. Mr. Gold remains determined, just as he always has, to overcome, move forward, and be the man his family, and so many others, depend on.

### 3. The Need to Provide Effective Medical Care

As this court is undoubtedly aware, federal prisons are not immune from COVID-19's devastating effects. Indeed, the overwhelmingly consensus amongst experts is that prison environments present unique challenges to containing outbreaks of COVID-19 within a penal system. Measures recommended by health experts to prevent infection and spread such as social distancing, frequently disinfecting shared surfaces, and frequently washing hands or using hand sanitizer are impossible or unfeasible in prison. Additionally, the mandated lack of individual living space, sanitation, and hygiene products further exacerbate correctional institutions' susceptibility. Moreover, because the majority of those who contract COVID-19 are asymptomatic, outbreaks in penal institutions are often not detected until after COVID-19 has already spread throughout the facility, often with devastating results. As an analysis led by researchers at Johns Hopkins Bloomberg School of Public Health concludes, the COVID-19 positivity rate for inmates is 5.5 times higher than the general US population, while their death rate is 3 times higher. Coronavirus deaths and infection rates higher in US prisons than general population, analysis finds, CNN, Jul. 8, 2020, available at https://www.cnn.com/2020/07/08/health/corona virus-prisons-death-rates/index.html.

Responding to these concerns, Attorney General Barr issued a memorandum instructing the BOP to "grant home confinement for inmates seeking transfer in connection with the ongoing COVID-19 pandemic." Prioritization of Home Confinement as Appropriate in Response to

COVID-19 Pandemic, Office of the Attorney General, Mar. 26, 2020, *available at* https://www.bop.gov/coronavirus/docs/bop_memo_home_confinement.pdf. Attorney General Barr outlined an inmate's: age and vulnerability as assessed by CDC guidelines, security level, conduct while in prison, re-entry plan, and crime of conviction, amongst other factors, would dictate whether the inmate should be continued to be housed in custody. *Id.* Moreover, the Justice Department has issued Guidelines intended to reduce the prison population.[1] The purpose behind these many measures is not simply to shield at risk inmates from complications due to COVID-19, but to promote and maximize, to the fullest extent possible, social distancing and sanitation efforts within the prison system and to prevent prison and community resources from being overrun with in the event of an outbreak of COVID-19.

If Mr. Gold were sentenced to prison earlier this year, it is likely that the fact that he is 47 years old and classified as low security level, has a solid re-entry plan, and committed nonviolent crime of conviction would have most likely lead the BOP to place him amongst the over 7,600 inmates on home confinement. COVID-10 Home Confinement information, *available at* https://www.bop.gov/coronavirus/.

Aside from the Attorney General's recommendations and BOP policy, Congress' directive to this court to consider Mr. Gold's health conditions prove a prison sentence is not appropriate. Mr. Gold's specific health conditions place him at a significantly higher risk of hospitalization and developing life-threatening complications if he were to contract COVID-19. Mr. Gold is obese,[2] asthmatic, has high cholesterol, and is borderline diabetic. The CDC's specifically designates Mr.

---

[1] U.S. Department of Justice Compassionate Release/Reduction in Sentence: Procedures for Implementation of 18 U.S.C. §§ 3582 and 4205(g), *available at*, <<*https://www.bop.gov/policy/progstat/5050_050_EN.pdf*>>.

[2] According to the CDC, Mr. Gold's height of 6'2" and weight of 310 pounds amount to Body Mass Index of 39.8 - the Obese category. Adult BMI Calculator, CDC, *available at* https://www.cdc.gov/healthyweight/assessing/bmi/adult_bmi/english_bmi_calculator/bmi_calculator.html.

Gold's health issues as those that place him amongst those with the highest risk of being hospitalized if he contracts COVID:



As detailed by CDC chart above,[3] all the factors that could place Mr. Gold in an extraordinarily vulnerable position would be present if he were to be sentenced to prison: (1) crowded situation; (2) enclosed space; (3) close/physical contact; (4) duration of exposure; (5) asthma (increases risk by x1.5); (6) severe obesity, BMI greater than 40%[4] (increases risk by x4.5); (7) diabetes (increases risk by x3). In addition, the CDC warns that the risk of hospitalization increases by 4.5 if a person has 2 pre-existing conditions, and by 5 if the person has 3 or more pe-existing conditions.

The BOP simply cannot adequately protect Mr. Gold from infection or hospitalization. The

---

[3] The chart can be accessed at https://www.cdc.gov/coronavirus/2019-ncov/covid-data/investigations-discovery/hospitalization-underlying-medical-conditions.html#:~:text=Risk%20for%20hospitalization%20if%20you,people%20without%20the%20condition(s)&text=*Conditions%20include%20asthma%2C%20obesity%2C,history%20of%20stroke%20and%20COPD.

[4] The addition of a mere two pounds moves Mr. Gold's BMI from 39.8% to over 40%.

combination of Mr. Gold's asthma, obesity, and borderline diabetic condition amount to extraordinary and compelling reasons for this court to refrain from fashioning a prison sentence. A sentence that carries possible death is simply far greater than necessary.

### 4. Recidivism, Restitution, Deterrence, and The Need to Promote Respect for The Law

Mr. Gold poses absolutely no threat or risk of re-offending. Mr. Gold is nearly fifty years old, a non-violent offender, who had zero criminal history before committing this offense. Since his arrest, Mr. Gold recommitted himself to serving as father figure his family needs him to be. On his own, Mr. Gold sought counseling to finally address the childhood trauma that pushed him down this self-destructive path. Through therapy, Mr. Gold stopped gambling and moderated his drinking. Mr. Gold also obtained a trucking license and enrolled in college courses in hopes of starting a new career in technology that will give him to the ability to make meaningful payments towards the restitution he owes. Since his arrest, Mr. Gold made great strides to not only further his earnest desire to leave the road that led to this offense far behind him, but to pave a path of retribution for those he wronged. These actions show Mr. Gold does not pose any threat or risk of committing another criminal offense. This court does not need to place Mr. Gold behind bars to protect society. Doing so would only frustrate Mr. Gold's efforts to pay down his share of the restitution and correct the wrong he did.

As for deterrence, it is usually divided into two subcategories, specific and general. Of course, specific deterrence is to deter Mr. Gold from defrauding any one or committing any other crime again. Mr. Gold stands convicted of a federal offense and will be branded a felon for the rest of his life. Yet, these markings hardly hold water to the emotional toll these proceedings have taken on him. Mr. Gold let down his wife, children, and community. Mr. Gold's crimes will forever

tarnish all the goodwill he worked so hard to build. The shame Mr. Gold felt led him to attempt to take his own life. Mr. Gold does not need to be confined to a prison cell to be convinced that what he did was terribly wrong. His sheer prosecution, and everything that came with it, pushed Mr. Gold to a point where he felt he no longer deserved to live. He is specifically deterred from committing *any* crime, much less fraud, ever again.

As to general deterrence, a message certainly needs to be sent to the community at large that fraud will not be tolerated and will be punished. Sending Mr. Gold to prison, however, is not the proper vessel to deliver that message. The empirical research shows little to no relationship between sentence length and deterrence. Countless studies find the *certainty* of punishment, not its severity, deters crime. *See United States v. Kloda*, 133 F. Supp. 2d 345, 347-48 (S.D.N.Y. 2001) (Hellerstein, J.) (in context of business crimes); *Sentence Severity and Crime: Accepting the Null Hypothesis,* 30 Crime & Just. 143 (Univ. of Chicago 2003) (arguing that severity of punishment does not deter crime); Jeffrey Grogger, *Certainty vs. Severity of Punishment*, 29 Econ. Inquiry 297, 308 (1991) (concluding increased certainty of punishment generates significant deterrent effects while increased severity produces insignificant results); William N. Trumbull, *Estimations of the Economic Model of Crime Using Aggregate and Individual Level Data*, 56 S. Econ. J. 423, 427-37 (1989) (analyzing data to conclude certainty of punishment has greater deterrent effect than severity); Ann Dryden Witte, *Estimating the Economic Model of Crime with Individual Data*, 94 Q.J. Econ. 57, 81-83 (1980) (maintaining certainty of punishment produces greater deterrent effect than severity of punishment). Specifically in cases such as this, the *certainty* of punishment, *i.e.* the inevitability of getting caught, prosecuted, and punished, deters the public, not the severity of prison time.

Mr. Gold 's conduct in this case has already resulted in certain punishment, a federal felony

conviction, which will affect numerous aspects of his life going forward. Congress specifically made available a sentence of probation because it believed that such a sentence could be sufficient punishment under certain circumstances. Following this logic, the Supreme Court has upheld a non-incarceration sentence.

In *Gall v. United States,* the defendant pled guilty to drug conspiracy in which he admitted to being responsible for at least 2,500 grams of ecstasy. 552 U.S. 38, 42 (2007). Though advisory guideline range was 30 to 37 months imprisonment, the district court sentenced the defendant to 36 months probation. *Id.* at 43-44. Explaining the sentence, the sentencing judge cited the defendant's lack of criminal history, family support, and significant self-rehabilitative efforts following the offense. *Id.* at 44. The government appealed and the Eighth Circuit reversed the sentence finding it to be too lenient. Rejecting the Eighth Circuit's conclusions, the Supreme Court asserted the sentencing court "quite reasonably attached great weigh to [the defendant's] self-motivated rehabilitation, which was undertaken not at the direction of, or under supervision by, any court, but on his own initiative." *Id.* at 59. Such actions, the Court continued, "lends strong support to the conclusion that imprisonment was not necessary to deter [the defendant] from engaging in future criminal conduct or to protect the public from his future criminal acts." *Id.*

The sentence Mr. Gold is requesting of the court is a serious one, befitting the offense of conviction. As the *Gall* Court observed, a felony conviction and a sentence of probation are serious punishments. *See id.* at 44 (affirming with the district court's assertion "that probation, rather than 'an act of leniency,' is a 'substantial restriction of freedom.'"). While custodial sentences are qualitatively more severe than probationary sentences of equivalent terms, offenders sentenced to probation are nonetheless subject to conditions which restrict their liberty. *See United States v. Knights*, 534 U.S. 112, 119 (2001) (inherent in the very nature of probation is that probationers do

not enjoy the absolute liberty to which every citizen is entitled). For example, those subjected to probation may not leave the judicial district, move, or change jobs without notifying, and, in some instances, receiving permission from their assigned officer or the court. *Id*. In addition, they must report regularly to their officers, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and abstain from excessive drinking. *See* U.S.S.G. § 5B1.3. Furthermore, most are also subject to individual "special conditions" imposed by the court.

Finally, Mr. Gold will always face the possibility of harsh punishment, including revocation of his probation, if he violates any conditions of his probation. Indeed, knowing that he may be sent to prison upon even the slightest violation will continue to remind the general, and specifically, Mr. Gold that probation is a harsh punishment. Mr. Gold, however, will not reoffend, will not violate his sentence, and will continue to rehabilitate himself and make sure restitution is paid in full.

## **CONCLUSION**

A prison sentence would simply go too far in this case. It would punish a man who committed a crime when he suffered from a mental disability and depression. Mr. Gold has worked hard to overcome his demons and addictions, and to mend the pain that caused it. Mr. Gold is clearly remorseful for his offense and will never re-offend. As the parsimony provision commands, this court should impose only the minimum sentence necessary to accomplish the rehabilitative and other purposes of criminal punishment. As former Attorney General Holder remarked, "we need to ensure that incarceration is used to punish, deter and rehabilitate — not merely to convict, warehouse and forget." Department of Justice, Attorney General Eric Holder Delivers Remarks at the Annual Meeting of the American Bar Association's House of Delegates (Aug. 12, 2013), http://www.justice.gov/iso/opa/ag/speeches/2013/ag-speech-130812.html. These words remain

17

true even under a new Department of Justice Administration. Mr. Gold pleads this Honorable Court to impose a sentence of probation, which is sufficient, but not greater than necessary to comply with the sentencing considerations.

                Respectfully submitted,

                /s/ Gal Pissetzky
                Gal Pissetzky
                Attorney for Steven Gold
                35 E. Wacker Dr., Suite 1980
                Chicago, IL 60601
                (312)-566-9900

## CERTIFICATE OF SERVICE

      I, Gal Pissetzky, the attorney for Defendant Steven Gold hereby certify that on September 11, 2020, I filed the above-described documents on the CM/ECF system of the United States District Court for the District of Connecticut, which constitutes service of the same.

      Respectfully submitted,

      /s/ Gal Pissetzky
      Gal Pissetzky
      Attorney for Steven Gold
      35 E. Wacker Dr., Suite 1980
      Chicago, IL 60601
      (312)-566-9900